I differ with the majority of the court in respect to this case, with some reluctance, and should cheerfully yield to their larger experience and maturer judgment, were my own convictions on the subject less strong than they are.
The differences which exist between us relate mainly to the principles of law applicable to the facts; but as we also disagree in some minor particulars as to the meaning and effect of the evidence, I deem it proper first to state those facts, which I consider established, or fairly inferable from the proof.
The plaintiff, having been nonsuited, is of course entitled to the benefit of the most favorable construction of the evidence, and the determination of all doubtful inferences, in his favor upon this appeal.
The case shows that he was injured on the evening of March 12, 1879, by the falling of a gallery, in Gilmore's Garden at New York. He was there as one of the spectators at a public exhibition called the International Walking Match, having paid the regular fee charged for admission to the entertainment. At the time of the accident, he was standing under the gallery *Page 257 
which fell, it being at the time occupied by a portion of the audience. The plaintiff's right to be in the place where he was injured, and his freedom from negligence, are not questioned. The evidence tended to show that the gallery gave way in consequence of vibrations, produced by its occupants in tramping, to keep time to the music, and the insufficient capacity and strength of the structure to support the audience while thus engaged. The plaintiff's right to recover against somebody for the injuries sustained is not disputed, but it is urged that the liability rests upon the lessee, and not upon the owner of the building. The case shows that the defendant, on March 8, 1879, leased the building in question, a spacious structure, apparently capable of accommodating a multitude of people, and covering an entire square in the city of New York, to one Kelley, for ten days, at a rental of $5,000. The premises were let for the express purpose,of enabling the lessee to give the entertainment, which was beingexhibited when the plaintiff received his injuries. So far as the case shows the building was in the same condition when leased as it was at the time of the accident, with the exception of a track and its railing which was constructed by the lessee for the use of the pedestrians. No provision was made in the lease for repairs by either party, and it appears thereby that any alteration by the tenant of the premises was prohibited, except upon the consent of the lessor first obtained, and upon the condition that they should be restored at the end of the term in the same state as when demised.
At the commencement of the trial it was conceded that the lessee had the right to make changes in the interior of the building, but subsequently the contract itself was produced and this concession was shown to be erroneous. The gallery was built on the westerly side of the building, extending a distance of about one hundred and twenty-four feet, and forming an extension of another gallery, constructed across the end of the building. It was, so far as appears, intended for use by spectators, and the extension was apparently built in the same way and supported in the same manner as the original gallery. *Page 258 
This extension was divided into twenty-four boxes or compartments with a passage-way running along the wall in the rear of the boxes and intended to facilitate access to them. The boxes were originally furnished with movable tables and chairs, and were designed to accommodate from four to six persons each, in witnessing entertainments, and partaking of refreshments, without leaving their seats, during the course of the performance.
It was conceded on the trial that at the time of the accident these tables and chairs had been removed, but by whom, or at what time, does not appear. There is no evidence that Kelley, the lessee, ever saw the chairs and tables, or knew how they were used, and no evidence from which a presumption would arise that he had done so. Even if it be conceded that he did know, it is not conceived how that fact can be material. The defendants certainly could not discharge the duty which they owed to the public, by simply notifying their lessee, that they did not consider the structure which they expressly let for theexhibition of a walking match, to be fit for that purpose.
Previous to the walking match this gallery had been used at the Arion and Mardi Gras festivals, by persons having charge of those entertainments, by leasing the boxes to individuals and parties desiring such accommodations, at prices exceeding those charged for admission to other parts of the building. The evidence tended to show that the supports of the gallery would have been sufficient to maintain the people who were admitted to it, on the night of the accident, had it not been for the stamping and boisterousness of the occupants. It was expressly conceded on the trial, by the defendants, that they did not build this galleryto be used for the purpose of such an exhibition as a walkingmatch, but that it was intended simply for the accommodation of a limited number of people. It is not claimed that thisintention and design was communicated by the owner to the lesseeor to any other person, or that any provision was inserted in the lease referring to the gallery, but it is contended by the defendant that its division into boxes was sufficient notice to all persons of its limited capacity, and imposed upon them any risk resulting from the admission *Page 259 
thereto, of a greater number of persons than it could safely hold, when it was also occupied by tables and chairs. Even if this circumstance be regarded as material, I do not think that it can be determined as a question of law. Taken in its most favorable aspect for the defendant, it presented a question of fact merely, for consideration by the jury. I do not think that the presence of boxes or compartments, in the gallery of a building intended to be used for public entertainments, necessarily affords notice of the limited strength and capacity of the structure wherein they are placed. It certainly furnishes no positive and definite indication of the number which it is designed to support, and the duty of communicating this information to the public rested primarily, I think, upon those who designed the structure, and knew its limited capacity.
It is, perhaps, true that persons of great caution and prudence might infer from the division of the gallery into boxes, that it was not designed to be filled to its utmost capacity, but to determine from this fact alone just how far it was safe to occupy it, and just when prudence would require access to it to be closed, is a question concerning which, people of varying degrees of intelligence, caution and sagacity might well differ. It must be remembered that this gallery was obviously designed for the use of spectators, and was intended by the lessor to be thrown open for their accommodation at public entertainments. The responsibility of deciding just how many people could safely be admitted to it during the course of an exhibition cannot justly be imposed either upon a temporary lessee or its temporary occupants, whose knowledge of its insecurity could only arise from the inferences which they might draw from the fact of its division into compartments. This question was one peculiarly for the consideration of a jury, and should not have been withdrawn from them.
The degree of liability which rests upon the owner of a building, toward those who sustain injuries therein, on account of defects in its structure, varies according to the use for which it is designed. In order to exempt him from liability in the case of a building let for hire, and designed for public *Page 260 
entertainments, the use for which it is intended should be so obvious from the form of the structure or other causes, that a variation from such use, can easily be distinguished by observers, and convey a clear idea of its restricted capacity. When a structure, however, is let by its owner for a particular public use, for which use he receives a compensation, there is always a warranty implied on his part that it is fit and adapted to the purpose for which it is let. There is generally no implied warranty upon the part of a lessor of dwellings or other private houses and buildings that they are fit and adequate to the purposes for which they are leased. (Jaffe v. Harteau,56 N.Y. 398.) But the rule is different with reference to erections in which public exhibitions and entertainments are designed to be given, and for admission to which the lessors either directly or indirectly receive compensation. In such a case the lessor, by renting the premises for such purposes and receiving a compensation therefor, holds out to the public that the structure is fit and safe, for the purposes for which it is let, and owes a duty to those who attend such entertainment, requiring him to use all reasonable precautions to protect them from at least any danger arising from the known imperfections of the structure. (Swords v. Edgar, 59 N.Y. 34; Camp v. Wood, 76 id. 92;Waggoner v. Jermaine, 3 Denio, 306; Francis v. Cockrell,
L.R., 5 Q.B. 184, 501; Nolton v. Western R.R. Co., 15 N.Y. 444; Thomas v. Winchester, 6 id. 397; Beck v. Carter,
68 id. 283; Grote v. C. H.R. Co., 2 Exch. 251; Campbell v.Portland Sugar Co., 62 Me. 552; Wendell v. Baxter, 12 Gray, 494.)
If a structure adequate in all respects for the purpose for which it is apparently designed be delivered into the possession of a lessee, who is under an obligation to keep it in repair, and while thus in his possession an accident occurs by reason of its want of repair, the liability for damages thereby occasioned doubtless rests upon the tenant alone. (Moak's Underhill on Torts, 258; Clancy v. Byrne, 56 N.Y. 129; House v.Metcalf, 27 Conn. 631.) So, too, when the tenant devotes the premises to uses other than those for which they are let, *Page 261 
and injuries occur in consequence of such an unauthorized use, the landlord would for that very reason be shielded from responsibility for the accident. (Moak's Underhill on Torts, 253;Ryan v. Wilson, 87 N.Y. 471.) But if any part of a structure, designed for occupation by the public, be so constructed that it cannot safely support all whom it has capacity to hold, it is obviously the duty of those authorizing its use by the public and knowing its insecurity, to take such precautions, either by giving notice, or limiting the number admitted, as will obviate any danger likely to arise from such defects. (Beck v.Carter, 68 N.Y. 283.) In such a case the burden of proof rests upon the lessor to rebut the presumption of negligence, arising from the facts, by affirmative evidence showing the adoption of reasonable precautions to avoid accident. (Mullen v. St.John, 57 N.Y. 567.)
I think it entirely immaterial to inquire whether the person injured in this case had a right of action against the lessee, since in actions of tort all of the persons contributing to the injury are liable for the damages occasioned thereby. It is sufficient here, to say that there was evidence upon which the jury might have found a breach of duty, on the part of the defendant, owing to the plaintiff, and from an omission to perform which he incurred injuries.
The theory now suggested, that the owner of a building designed to be let for the use of public entertainments has, upon letting the same to a temporary occupant, thereby imposed upon such occupant, and relieved himself from, all liability to persons lawfully attending an exhibition therein, and receiving injuries through defects in its original structure, is a startling one, and is so opposed to what I believe to be settled law that I am unable to assent to it.
The principles upon which such owners have been held liable to the public, visiting their premises and receiving injuries thereon, through defects in their construction, have been frequently discussed and adjudged in the courts, in the cases cited as well as others, and a proper regard for the authorities, not only in our own court, but in those of other States and countries, *Page 262 
seems to me to require the reversal of the judgment appealed from. This liability springs out of the obligation resting upon them to so guard their property, that persons entering upon it by their permission or invitation shall not be injured through any omission of theirs to take all reasonable and prudent precautions to insure the safety of such persons; and this liability becomes more imperative when the owner derives an income from such use of the property. I have supposed that it was an incontrovertible principle of law, when in the exercise of any business or calling, by whomsoever exercised or however carried on, which involves the safety, health or lives of the public, that the person pursuing such calling or business is held to the exercise of the highest degree of care in the prosecution thereof. Illustrations of this principle are found in the cases, relating to the compounder of drugs and medicines, the builder of houses or structures abutting upon streets or public highways, carriers of passengers, and manufacturers of tools or instruments to be used in a hazardous business. This liability does not rest upon the theory of an express contract, between the owner and the person receiving the injuries, but is predicated upon the obligation which the law imposes upon all, to so keep and use their property that others using or entering upon it by their invitation, shall not be injured by its improper condition or unfitness, and its inadequacy for the purpose to which it has been devoted.
Whether it be said that the circumstances raise an implied warranty upon the part of such owner toward those accepting his invitation, or impose a duty upon him with respect to the safety of the public, I regard as entirely immaterial. The natures of the respective obligations seem to be similar and possibly are identical, but either in one form or the other, the liability of the owner seems to have been adjudicated in many cases. When the plaintiff has given evidence tending to show an omission, upon the part of the owners, to perform their duty, he has established a case sufficient to go to the jury, and if there are any circumstances, tending to excuse the apparent neglect of the owner, it is for him to show them. *Page 263 
Here the facts are expressly admitted that the owner, knowingthe unfitness of the premises for the purpose, let them to beused for a walking match, and the accident occurred in consequence of their unfitness for the purpose. This apparently made a good prima facie case for the plaintiff under the authorities, and should have compelled the defendant to enter upon its defense.
I have been unable to see any material distinction between this case and that of Swords v. Edgar. The defendants in that case were the owners of a pier, kept for the accommodation of vessels receiving and discharging cargoes in the port of New York, and was leased by them to a steamship company from May 1, 1865, for a period of five years with a covenant from the lessees, to keep it in order and repair during the term. The pier was defective at the time it was let, and fell from that cause, while in the possession of the lessees on May 9, 1866, killing the plaintiff's intestate, who was then engaged, in unloading a cargo, from a vessel lawfully lying at the pier. There was evidence tending to show that the pier was too heavily loaded, at the time of the accident. It was held that the lessors were liable for the damage occasioned by its imperfections. It was said by Judge FOLGER in that case "that the defendants demised the premises to other parties, binding them in a covenant, to keep the pier in good order and repair. The defendants were not in possession of the premises at the time of the accident. It is claimed that thereby the defendants are under no liability to the plaintiff. We have shown that this pier, so far as the intestate was concerned, was in the nature of a public place whereon he was lawfully engaged. We have shown that it was of such a nature that there was, as to him, a duty resting somewhere to keep this pier in a reasonably sound and secure condition." The learned judge, then continuing, says that primarily this duty rested upon the occupants of the pier, but further says that there may be a state of facts which will also cast a liability upon the lessors, and proceeds as follows: "When there has been a nuisance of continued existence upon demised premises, the lessor and lessee may both be liable for damages resulting *Page 264 
therefrom. The lessee in the actual occupation of the premises, if he continues the nuisance after notice of its existence and request to abate it, and the lessor, if he first created it and then demised the premises with the nuisance upon them, and at the time of the damage resulting therefrom, is receiving a benefit therefrom by way of rent or otherwise." It was also held that proof of misuse of the structure by the tenant in overloading it did not in that case relieve the lessors from liability. It has been said that this case is inapplicable to the one in hand because it proceeds upon the ground that the defect therein complained of constituted a nuisance, and that such an element is wanting in this case. It is not seen, however, wherein a defect in the structure of a pier, designed for the use of that class of the public engaged in commercial pursuits only, can be called a nuisance, and a similar defect in a church, theatre or other place of public amusement, which the public generally are invited to use, can be fittingly described by any other term. That case was in many important respects, and particularly in relation to the restricted class entitled to use the pier, the covenant to repair assumed by the lessee, the lapse of time after the letting, and the combination of natural decay with the original defect in construction producing the accident, a much stronger case for the defendant than the one now under consideration. Neither do I think the case of Camp v. Wood can be distinguished from this by any material circumstances. There the action was against an innkeeper who had let to others for a compensation, a hall in the third story of his house for the purpose of enabling them to give a dancing entertainment, to which all persons were invited who were willing to pay the admission fee charged therefor. The plaintiff had paid his fee, and was injured by falling from a doorway, in the second story of the house, which it was charged had been negligently left open or unlocked by the owner. It was said by Judge ANDREWS in delivering the opinion of the court: "It is insisted that he (the defendant) owed no duty to the plaintiff which imposed upon him any obligation to make the premises safe, and to see, so far as he reasonably could, that the door was kept closed so as to prevent *Page 265 
accident. This claim cannot, we think, be maintained. He let the premises for hire, and it is admitted by the pleadings that the public were invited to the hall with his consent and knowledge, whenever it was let for a public purpose. The plaintiff was rightfully there upon the invitation of the managers of the entertainment implied from the public character of the assembly, their accepting the entrance fee paid, and his admission to the hall." "In this case the defendant, by letting the hall for public purposes, held out to the public that the hall was safe, and he was bound to exercise care to provide safe arrangements for the entrance and departure of people who came there upon his invitation." The main difference in these cases seems to be that here, the defect existed in that part of the structure which was specifically let for a walking match, and in that, to a part of the structure which was not let, and as to which no contract could be implied, except one arising out of a duty imposed.
It could hardly be contended that such a difference favors the contention of the defendant here. The case of Francis v.Cockrell is a leading case in England and was thoroughly and exhaustively considered both by the Queen's Bench and in the Exchequer Chamber. The head-note of the report in the Exchequer Chamber reads as follows: "A man who causes a building to be erected for viewing a public exhibition, and admits persons on payment of money to a seat in the building, impliedly undertakes that due care has been exercised in the erection and that the building is reasonably fit for the purpose, and it is immaterial whether the money is to be appropriated to his own use or not." Referring to the case of Grote v. Chester Holyhead RailwayCo. (2 Exch. 251), which was an action by a passenger, on the Shrewsbury and Chester railroad, to recover damages for injuries received in consequence of the falling of a bridge, built by another railway company, and leased by them to the company upon whose cars, the plaintiff was riding when the accident occurred, Chief Baron KELLY says: "The question was whether the defendants who had caused the bridge to be constructed by an engineer with whom they had entered into a contract, had not entered into an implied contract *Page 266 
with everybody who had occasion lawfully to make use of the bridge and pass over that bridge, that it was reasonably fit for the purpose for which it was to be applied; that is, that it was safe and secure against ordinary risks and dangers for any one to pass over it. It was held that the defendants had entered into such an implied contract and they were held liable for the consequences of the defect." This extract is preceded by the remark, "I cannot understand upon what imaginable ground it is to be supposed that there is not such an implied undertaking in every contract of this description." He further says: "First, there is the principle which I hold to be well established by all the authorities that one who lets for hire, or engages for the supply of any article or thing, whether it be a carriage to be ridden in, or a bridge to be passed over, or a stand from which to view a steeple chase, or a place to be sat in by anybody who is to witness a spectacle for a pecuniary consideration, does warrant and does impliedly contract that the article or thing is reasonably fit for the purpose to which it is to be applied." Baron MARTIN in the same case says: "I do not at all pretend to say whether the relation of the parties raised a contract, or a duty. It seems to me exactly the same thing; but I am of opinion when a man has erected a stand of this kind for profit, that he contracts impliedly with each individual who enters there and pays money to him for the entrance to it, that it is reasonably fit and proper for the purpose, or if you choose to put it in another form, that it is the duty of the person who so holds out a building of this sort, to have it in a fit and proper state for the safe reception of the persons who are admitted." It may be said with reference to this case that it is to be distinguished from the case at bar, from the fact that there the defendant was one of a committee, who received directly the moneys paid for entrance by the spectators, although they acquired no interest therein, inasmuch as they were devoted by the committee to the use of the public in expenses for prizes, and other charges incurred in supporting the races. But that case was decided irrespective of any such distinction and the Grote Case was expressly approved by most of the six *Page 267 
judges delivering opinions. Analogous authorities on this subject will readily recur to the mind of every lawyer, and might be almost indefinitely cited; but sufficient have already been referred to, to explain the reasons, which have controlled my judgment in the consideration of this case. My opinion of the case rests upon the undisputed facts, that the defendants let Gilmore's Garden for a walking match, a purpose for which they admitted it was not designed, and knowing its unfitness for thatpurpose, took no precautions other than those derivable from its general appearance, to warn either their lessee or the public, of its want of fitness for such a purpose. The building was used by the lessees only for the purpose for which it was specifically let, and if there was any part of it, not adapted to such a use, it was the duty of the lessor to adopt effectual means, to permit only such a use as was consistent with the safety of those attending the entertainment. It cannot be held, I think, as matter of law upon the proof in the case that the defendants discharged the duty which they owed to the people, who visited it to the lessor's profit and by their consent, authority and invitation.
RAPALLO, ANDREWS and MILLER, JJ., concur with EARL, J.
DANFORTH and FINCH, JJ., concur with RUGER, Ch. J.
Judgment affirmed.